**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 0 4 2022

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**ESTELLA L. MORRIS**                                                    **PLAINTIFF**

**v.**                              CASE NO: 4:22CV-956-KGB

**DENIS MCDONOUGH,**
**SECRETARY OF VETERANS AFFAIRS,**
**DEPARTMENT OF VETERANS AFFAIRS**                        **DEFENDANT**

## PLAINTIFF'S COMPLAINT

Comes now the Plaintiff Estella Morris by and through her Attorney, Ben Honaker, and for her Complaint states:

1.     Plaintiff Dr. Estella Morris is a resident of Pulaski County, Arkansas.

2.     Defendant is a resident of Pulaski County, Arkansas.

3.     This case concerns Plaintiff's employment by Defendant which occurred in Pulaski County, Arkansas.

4.     This court has jurisdiction pursuant to 28 U.S.C. 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States.

5.     This court has personal jurisdiction over the Defendant because the Defendant organization is resident of Pulaski County Arkansas.

6.     Jurisdiction is proper in this matter as Plaintiff has exhausted all administrative remedies through the U.S. Equal Employment Opportunity Commission, Memphis District Office and been released to pursue a judicial remedy.

This case assigned to District Judge _Baker_
and to Magistrate Judge_ _Ervin_

1

7.      Venue is proper pursuant to 28 U.S.C. 1391(b) because the Plaintiff's employment by defendant which is the subject of this complaint occurred in this district.

## FACTUAL BACKGROUND

8.      Plaintiff, Dr. Estella Morris, is and was at all relevant times the Program Manager for the VA Comprehensive Homeless Center at Central Arkansas Veterans Healthcare System.

9.      Plaintiff Dr. Estella Morris is a veteran of the Army National Guard and Navy Reserves.

10.      Plaintiff Dr. Estella Morris is a disabled veteran.

11.      Michael Ballard, Associate Chief of Staff for Mental Health, and Dr. Catina McClain Chief of Staff for Central Arkansas Veterans Healthcare System are the next two individuals in Dr. Morris's direct chain of command.

12.      Dr. Morris was included in investigations that had nothing to do with her because of her race and color. This was an attempt to remove her, along with Mr. Hemphill from the program prior to the move to Main Street. The individuals interviewed about her during the investigation for the claim that had been filed against Mr. Hemphill had no knowledge of the employee filing the complaint and could not attest to the work environment during the period in question. Dr. McClain and Mental Health Service, with the full support of medical center leadership, launched a full-fledged witch hunt against Dr. Morris because of her race and color. The efforts against Dr. Morris became more intense, the closer it got to time to relocate to Main Street in downtown Little Rock.

13.      The investigation into Mr. Hemphill and Dr. Morris determined that the allegations against them were unfounded. However, Lisa Martone was assigned as supervisor to Dr. Morris for a six-month period and was relocated to the Veterans Day Treatment Center as an "overseer,"

2

although, Dr. Morris was in no way involved in the work assignment that led to the previous investigation. This overseer, Ms. Lisa Martone, with the help of Mental Health Service attempted to set-up a scenario where Mrs. Anne Wright would be perceived as the leader of the Homeless Program despite having been hired into the program two years prior by Dr. Morris. This was done by having people contact Mrs. Wright for information regarding the Homeless Program, instead of Dr. Morris, the program manager. At one point, Dr. McClain and Lisa Martone, burst through the door and into Dr. Morris' office, appearing to be very angry and startling Dr. Morris. When she stood from her desk, she was blocked against her credenza by Dr. McClain who towered over her by several inches in height and size and by Ms. Martone who stood behind Dr. McClain. Both Dr. McClain and Ms. Martone were between Dr. Morris and her exit door. According to Dr. Morris, Dr. McClain proceeded to accuse Dr. Morris of having gone to Building 33 and spoken to John Rader, Deputy Director for the Veterans Integrated Service Network (VISN) and having advised him that they were trying to get rid of her. Dr. Morris advised Dr. McClain that she did not go to the building to meet with Mr. Rader. She and Mr. Hemphill had been in the building for a training. While there, they decided to stop by and speak with Mr. Rader, with whom Dr. Morris had worked closely as the VISN Homeless Coordinator. Dr. Morris advised Dr. McClain further that while they were there, Mr. Rader inquired as to how things were going. At that time Dr. Morris informed him that she felt that Dr. McClain and Mental Health Service were trying to get rid of her. Dr. Morris then reminded Dr. McClain that this was not information that she had volunteered but a statement that she had made in response to an inquiry. She then asked Dr. McClain, "Did I not say the same to you?" When Dr. McClain responded yes, Dr. Morris then said, "I don't talk behind anyone's back, … anything I say to anyone else about you, I will have already said it to you." This incident is one example of the hostility and intimidation tactics that have been used against Dr.

3

Morris, and these types of events have been perpetrated so frequently that they cannot be truthfully described as isolated or uncommon.

14.     In 2016 Dr. Morris applied for the GS-14 position of Chief of Social Work Service within the VA.

15.     The position of Chief of Social Work Service was advertised to all United States Citizens, and, pursuant to Title 5 as it existed in 2016, pass over procedures were required in the event of the selection of an individual who is not a preference eligible.

16.     Dr. Morris, as a disabled veteran and she is a preference eligible. Dr. Morris was entitled to 10 veteran preference points and submitted her letter of preference at the time of her application.

17.     Dr. Morris did not receive the position of Chief of Social Work Service. Instead, a pathway for advancement had been created by an employee Dr. Morris had hired around 2010, who had been a Chief of Social Work at UAMS. Dr. Morris was told that she had to hold the position for this candidate, although she was not able to report at the requested time. A plan seemed to be underway. In 2012, when Lisa Martone was placed in the Homeless Program to replace Dr. Morris with Anne Wright, allowing her to gain the one-year time-in-grade she would need to apply for the Chief of Social Work position. When this plan did not materialize, the Anne Wright was placed in a newly created GS-13 position to allow her to gain the GS-13 grade, giving her the required time-in-grade to apply for the GS-14 position when the Chief Social Work Service retired according to plan. The individual hired had limited institutional knowledge other than what she had learned while under the supervision of Dr. Morris. Additionally, while this individual had functioned as a Chief Social Work Service for a state agency, Dr. Morris had functioned as a program manager with more senior level social workers than any other supervisor in the medical

4

center. Additionally, Dr. Morris completed one year of on-site VA national training to be Chief of Social Work Service in the VA; one year of on-site national training with the University of Alabama at Birmingham to be a VA Manager; and one year of on-site VA national training to be a VA Medical Center Director. She is the only clinical staff person at the medical center to hold a PhD in social work, along with multiple local and national awards, and she has twice testified before Congress.

18.     At no point were the pass over procedures followed, as required by Title 5 statutes and regulations. A hiring manager may not pass over a preference eligible to select a non-preference eligible unless there are grounds for passing over the preference eligible and the agency has complied with the pass over procedures. A pass over was never requested by the Office of Professional Management ("OPM"), and the required forms explaining the reasons for Dr. Morris' non-selection were never created. This constitutes a violation of federal law. This violation of the law flows from the pattern of hostility and discrimination against Dr. Morris. It was also done in retaliation and reprisal for Dr. Morris prior EEOC activity and complaints regarding discrimination in her work environment.

19.     Pursuant 5 U.S.C.A. section 3318, as a preference eligible, Dr. Morris was entitled to view reasons submitted by the appointing authority in support of her pass over and the findings of the office. The VA's failure to follow the appropriate pass over procedure resulted in a clear violation of the law.   This was an external job announcement and required a pass over through OPM. Instead, in a discriminatory move, someone who had been hired into the system by Dr. Morris, was hired over her with no attention to her status as a Veteran, who also has a service-connected disability. Dr. Morris had not only been deemed eligible but was said to have been one

of the top two leading candidates for the job. Yet, despite her years of training and her wealth of institutional knowledge, she was not selected for the job.

20.     Mrs. Wright was the individual who received the position.

21.     Mrs. Wright had only been an employee of the VA for approximately four (4) years by the time she received this promotion.

22.     Mrs. Wright is Caucasian, and it is unheard of in the VA for a four (4)-year employee to receive such a selection.

23.     Mrs. Wright is significantly younger than Dr. Morris by approximately 15-20 years.

24.     When this position was open, Dr. Morris had over 35 years of federal experience.

25.     Mental Health Service and Medical Center Leadership have systematically sought to defame Dr Morris' professional character, and to diminish her authority as a program manager. This has been ongoing since 2012.

26.     Later, as a result of an Administrative Investigative Board (AIB) investigation completed on January 22, 2019, Dr. Morris's selecting official hiring authority delegation was rescinded.

27.     That AIB investigation was precipitated by two complaints filed by a disgruntled employee complaining about incidents that occurred during times when Dr. Morris was not even on the premises of the Homeless Center.

28.     While there are over 45 employees in the unit, only 22 witnesses, including Dr. Morris, Mr. Hemphill, Dr. McClain, Dr. Kuo, and Mr. Ballard, were interviewed. Some of those 22 witnesses had not worked in the Homeless Program for several years. Yet, their opinions were included and considered when rendering a decision on certain alleged current, ongoing issues

6

within the program. In fact, only 12 of the 22 witnesses interviewed were current employees of the Homeless Program.

29.     The AIB investigation was based on trumped up complaints of an employee and undertaken, along with the resulting recension of Dr. Morris's hiring delegation authority, in an attempt to retaliate against Dr. Morris for prior EEO activity.

30.     Agency Representative, Margie Scott, testified that the AIB revealed concerns about potential prohibited personnel practices ("PPP") by Dr. Morris and signed the AIB Report of Investigation (Certificate of Completion) Memorandum on March 12, 2019.

31.     Michael Ballard stated in a Memorandum dated May 14, 2019, that the Selecting Official Authority Delegation was revoked from the managers of the program until further determination by Mental Health Leadership.

32.     Agency Representative, Benjamin Vincent, provided a list of two Caucasian GS-13 Program Managers in Mental Health Service who had been detailed from their supervisory responsibilities which included selection authority; however, overseers were not detailed for the Caucasian managers.

33.     Dr. Morris's selection authority was rescinded while she was serving in her role as Program Manager of the Comprehensive Homeless Center Program.

34.     Because of the AIB, a temporary supervisor, Mrs. Robin Atkins was detailed to the Veterans Day Treatment Center for an initial detail of ninety (90) days which was extended to six (6) months of daily oversight. This had never happened with Caucasian managers. Ms Atkins, who was detailed to the Homeless Program as an overseer was later accused of multiple infractions, which were aired on national TV. Regardless of whether the allegations were true, the fact is that it aired on FOX 13, yet no one was sent to oversee her work site following the investigation. Ms.

7

Atkins and the other referenced white managers were treated differently because they were White, while Dr. Morris is Black. *See* https://www.fox13memphis.com/news/arkansas/fox13-investigates-after-whistle-blower-alleges-malpractice-one-largest-veterans-centers-country/YRHRLCDAIZHF7KGFPFCNCW33OE/

35.     The detail of Robin Atkins was extended through October 2019.

36.     Agency Representative, Margie Scott, testified Robin Atkins was detailed to the Veterans Day Treatment Center by the Chief of Staff (Dr. Catina McClain) to assist the program in daily operational activities, looking at workflow, clinic structure, productivity, and efficiency of operations. However, the ideas that were attributed to Ms. Atkins regarding workflow, clinic structure and productivity had already been put in place by Dr. Morris due to national requirements for VA Homeless Programs. Additionally, they had been engaging in regular training on coding and productivity with Strategic Management, to ensure that they were maximizing reimbursements to the medical center. There was also had a coding champion who was responsible for providing guidance to all new employees.

37.     Dr. Catina McClain detailed Robin Atkins to the Veterans Day Treatment Center, effective May 19, 2019, for a minimum of ninety (90) days with the option to extend the detail.

38.     The Memorandum to Robin Atkins regarding her duties during the detail authorized her to review daily operations, functions, staff interactions/workplace climate, and to provide guidance and assistance in improving operations. What Ms Atkins was able to witness, however, was a small group of staff who felt that they were protected by medical center management. These employees were determined to be the lowest producing staff in the program. This was validation of what Dr. Morris had been reporting. Ms Atkins was also able to witness that the workplace climate was much more tense when a particular problematic employee was present. This was the

same employee who was reported to have filed false information which contributed to the AIB taking place. This was the same employee who has reportedly applied for approximately 30 jobs outside of the Homeless Program but has not been selected due to her reputation.

39.     Robin Atkins was required to report directly to Dr. Morris's first line supervisor, Michael Ballard during her detail.

40.     Agency Representative Dr. Catina McClain is Robin Atkins' second line supervisor.

41.     Robin Atkins was required to report her findings to Dr. Catina McClain during the detail. Prior to Ms Atkins leaving the program, she suggested to Dr. McClain that she meet with Dr. Morris and Mr. Hemphill to hear their side of the story. According to email records, Dr. McClain contacted Dr. Morris on August 5, 2019, to schedule a meeting. The meeting which was initially scheduled for August 7th had to be rescheduled and was finally held in October. This meeting which was seen as very positive and promising was held in the office of the Medical Center Director on the North Little Rock VA campus. This was the first time that Dr. Morris and Mr. Hemphill were given the opportunity to be heard.

42.     On March 17, 2021, Plaintiff was made aware that Ballard made the statement regarding her, "The only reason she receives an outstanding performance evaluation is because I am scared that she will file and EEO complaint against me." It is clear that Mr. Ballard has admitted to engaging in lack of candor on official government forms. Additionally, Mr. Ballard's statement alleges that Dr. Morris is prone to filing frivolous complaints, which is typical of the type of inflammatory, degrading, and derisive remarks to which Dr. Morris has been subjected since 2012.

43.     On March 23, 2021, Ballard made errors, omissions, and misrepresentations of Plaintiff's title and the nature of her position on her application for promotion that misled the

decision-maker in promotion matters, effectively barring her from her well-deserved GS-14 promotion, which was also supported by the new Social Work Standards.

44.     Dr. Morris' position of Program Manager qualifies for a promotion to GS-14.

45.     Dr Morris has still not received a promotion to GS-14.

46.     Dr. Morris received the following amounts for her salary at the VA for the relevant years as a step 10 GS-13: in 2016 she was paid $109,781, in 2017 she was paid $111,560, in 2018 she was paid $113,428, in 2019 she was paid $115,313, in 2020 she paid $118,603, in 2021 she was paid $116,999.

47.     In 2016, Dr. Morris was a step 10 GS-13 being paid $109,781, and had she received the GS-14 and transferred to the GS-14 pay scale she would have begun the position as a step 5 GS-14 being paid $113,091 annually.

48.     As a GS-14 step 5, Dr. Morris would have had a one-step increase on the GS pay scale in 2018 to GS-14 step 6, an increase to GS-14 step 7 in 2020 and a pending increase to GS-14 step 8 in 2023.

49.     The expected step increases and corresponding pay rises for Dr. Morris in the GS-14 position for the relevant years are as follows: Step 5 in 2016 making $113,091, a step 6 in 2018 making $118,312, a step 7 in 2020 making $123,727, a pending increase to step 8 in 2023 making $129,282.

50.     At all times since, Dr. Morris has been subjected to intimidation, hostility, belittling, and the undermining by her supervisory authorities due to her race and color. There has been a pattern of hostility and a systematic approach to ensuring that her reputation is developed in a negative light and that she is prevented from advancing within the agency. Furthermore, Dr.

Morris' brave exposure of these facts through Equal Employment Opportunity complaints has led to retaliation against her.

51.     The Agency has regularly created illegal pathways of promotion to keep Dr. Morris, and other persons of color in their places. One example is Ms Wright being promoted over Dr. Morris in 2016 for a position that was announced in 2015 without the appropriate pass over procedures being followed. This is just one example of many. Mr. Ballard was at the medical center approximately eight years before being promoted to GS-14 and was in the GS-14 position less than two months before being placed in an acting role at the GS-15 level to which he was later promoted. Neither of the two White males nor Ms Wright, a White female, have completed any VA management training other than the basic annual training offered to all VA supervisors. The same can be said of Dr. Kuo and Dr. McClain. These same actors and the agency regularly engage in "obstructing competition." This is precisely what happened when Mr. Ballard failed to submit a complete promotion packet for Dr. Morris in 2020 based on the new Social Work Qualification Standards published in 2019, as outlined below. At the same time, he changed her job title on the application packet and took segments from her functional statement to use in promoting Michael Ritchie, a White male who had been at the medical center less than 10 years and had been in his position as a manager less than five years. Mr. Ritchie's title when it was held by Mr. Ballard was Social Work Discipline Lead, Deputy ACOS Mental Health. When the Social Work Standards changed, his title suddenly became Program Manager, while he chose to change Dr. Morris's title from Program Manager as it had been since 1995 to Coordinator, a title known to have no promotion potential to GS-14. This act was to ensure that Mr. Ritchie was promoted.

52.     Dr. Morris has consistently received "agency retaliation." Despite her 45 years of federal employment, she never had a formal complaint initiated against her. In each instance of

discipline, a case was initiated against someone under her supervision, and her name was added to the case in a targeted effort to hurt Dr. Morris' career and reputation. There were ongoing efforts to support the actions of any employee thought to potentially have negative feelings toward Dr. Morris. With the most recent AIB, Mr. Hemphill was advised to issue an admonishment to two employees in response to a policy violation involving an argument between two employees. One employee chose not to accept the admonishment and went to the chief of staff who overrode the actions of the manager who acted at the direction of Human Resources. Dr. McClain mitigated the admonishment down to a verbal counseling. This action has contributed to ongoing AFGE and EEO actions by the same employee, who despite her own acknowledgement, has applied for more than 25 jobs and not been selected. This employee continues to engage in negativity, contributing to a hostile work environment in the Homeless Program, which has no management support. Furthermore, in 2013, Lisa Martone was sent in for six months as an overseer. This was done to undermine Dr. Morris as a manager. The same occurred following the AIB. Robin Atkins was sent in as an overseer. This did not happen with the Caucasian managers. This attempt at character assassination and lack of management support was very stigmatizing and had a lasting impact on how staff views Dr. Morris as a manager.

      53.     The foregoing comprises only a few of the prohibited personnel practices in which the agency engaged. Yet, a very costly AIB was initiated in response to what was identified by the agency representative as "concerns about potential prohibited personnel practices by Dr. Morris." After 35 years of legitimate hiring practices by Dr. Morris, it is the agency who has shown that it engages in PPP. The forgoing does not even begin to delve into the many pathways for advancement created by the agency. In the case of Dr. Morris, all of these things were done as a direct response to Dr. Morris' race and color, and her prior EEO activity.

## FAILURE TO PROMOTE

54.     The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

55.     To Establish a prima facie case of race or sex discrimination for a failure-to promote claim, under Title VII, a plaintiff must show that: (1) she is a member of a protected group, (2) she was qualified and applied for a promotion to an available position, (3) she was rejected, and (4) similarly situated employees, not part of the protected group, were promoted instead. *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081 (8th Cir. 2011).

56.     Plaintiff is a member of a protected group as an African American Black woman and a disabled veteran. Plaintiff was 67 years old at the time that she was passed over for selection for the Chief of Social Work Service as part of a deliberate violation of law that disregarded the required pass over procedures. There has been a significant increase in her duties and significant growth in her staff since Dr. Morris obtained the GS-13 position in 1995. At one time in 1988, Dr. Morris was the only employee in the program. At the time that she was promoted to GS-13, there were seven staff in the program. The program now has 48.2 staff. Dr. Morris' commitment and performance have been exemplary, and yet she has been targeted, vilified, and sabotaged when she seeks advancement.

57.     Plaintiff was qualified for and applied for the available GS-14 promotion. Dr. Morris possesses a wealth of institutional knowledge accrued over more than 41 years in the VA Medical Center System and her 45 years in Federal service. Additionally, she completed site-based training in the Social Work Administrative Leadership Training Program to be Chief of Social Work, VA Management Development Training with the University of Alabama at Birmingham to be a program manager and training with Leadership VA to be a VA Medical Center Director.

58.     Plaintiff was rejected for the position

59.     Dr. Morris became aware that Mr. Michael Ballard stated, "The only reason she receives an outstanding performance evaluation is because I am scared that she will file and EEO complaint against me."

60.     Mr. Ballard's hostility toward Dr. Morris was further exposed when he deliberately made misrepresentations, errors, and omissions regarding Dr. Morris's title and the nature of her position when filling out an application for Dr. Morris's promotion.

61.     Due to her race, reprisal, age, and gender, Dr. Morris's promotion request for GS-14 was denied even though she has been a program manager since 1995.

## RACIAL DISCRIMINATION

62.     The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

63.     The Plaintiff suffered an adverse employment action when she was appointed Mrs. Anne Wright as a supervisor for no valid reason and had her hiring authority rescinded after her initial EEO Complaint.

64.     The appointment of Mrs. Lisa Martone as Dr. Morris's supervisor, the recension of her hiring authority, and the appointment of Robin Atkins to oversee the program, and the appointment of Mrs. Anne Wright as Dr. Morris's supervisor and the recension of her hiring authority directly undermined Dr. Morris's authority within her department and showed that those in her chain of command felt that an African American woman could only be trusted to do her job under the close supervision of a Caucasian. This was despite Dr. Morris being nationally recognized, highly trained and the recipient of many local and national awards for her service to Veterans experiencing homelessness and despite her having independently built the program from

14

a point where she was the only employee to a point where they now have 48.2 employees when fully staffed.

65.     The adverse employment action suffered by Dr. Morris was because of her race.

66.     The Plaintiff suffered an adverse employment action when the proper procedure was not followed regarding her potential promotion. The violation of law in the hiring process is part and parcel of the racially discriminatory and hostile environment that is created within the agency by Dr. McClain, Mr. Ballard and others in management. There is a culture of hostility that has been directed toward Dr. Morris with devastating effect.

67.     An adverse employment action was suffered by the Plaintiff when she was subject to hostile, intimidating, and belittling conduct at the hands of Mr. Ballard and others in management.

## AGE DISCRIMINATION

68.     The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

69.     Dr. Morris has suffered age discrimination at the hands of the Department of Veterans Affairs.

70.     To set forth a prima facie case of age discrimination, an employee must show that: (1) she was over 40 years of age; (2) she was meeting his employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

71.     Dr. Morris was over 40 years of age at all times in question regarding this action.

72.     Dr. Morris consistently receives stellar performance evaluations.

73.    Dr. Morris has suffered adverse employment action including but not limited to the recension of her hiring authority, having overseers detailed to micromanage her, disparaging comments regarding her and her staff, and more.

74.    The person who received the position of Chief of Social Work Service was significantly younger than Dr. Morris by approximately 15-20 years.

75.    Therefore, Dr. Morris has suffered age discrimination at the hands of the Department of Veterans Affairs.

### HOSTILE WORK ENVIRONMENT

76.    The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

77.    Dr. Morris was subjected to a hostile work environment by the Department of Veteran's Affairs.

78.    Dr. Morris is a member of a protected group as an African American Black woman who is over the age of 40

79.    Dr. Morris was subject to harassment in the form of the recension of her hiring authority, the placement of an overseer in her unit, and in Mr. Ballard's purposeful prevention of her advancement when she applied for promotion to GS-14 level.

80.    Other program managers who were not African American did not suffer similar oversight and investigation.

81.    The recension of Dr. Morris's hiring authority undermined her authority and served as a professional embarrassment.

82.    This harassment was perpetrated, rather than prevented, by those in Dr. Morris's chain of command.

## **RETALIATION**

83.     The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

84.     Dr. Morris experienced retaliation at the hands of Mr. Ballard after she submitted her initial EEO Complaint, Case No. 2003-0598-2021103775, which is a protected activity under Title VII.

85.     The entire AIB investigation Dr. Morris was subjected to was retaliatory in nature, as evidenced by the biased selection of a limited number of witnesses from the program, as well as individuals who were no longer even employed in the program and had not been for several years, in some cases.

86.     Additionally, Dr. Morris was not even on the premises of the Homeless Program when the events that precipitated two separate complaints occurred that led to the AIB investigation.

87.     On May 14, 2019, Mr. Ballard, Acting ACOS/Mental Health, subjected Dr. Morris to and adverse employment action by rescinding her selecting official authority delegation until further notice and assigned her a temporary supervisor.

88.     Dr. Morris, a decades-long VA employee with an impeccable record, had never been subjected to such oversight or a recension of duties in her career.

89.     Dr. Morris only experienced such treatment after submitting her initial EEO Complaint.

90.     Additionally, on March 17, 2021, Plaintiff was made aware that Ballard made the statement regarding her, "The only reason she receives an outstanding performance evaluation is because I am scared that she will file and EEO complaint against me."

91.     On March 23, 2021, Ballard made errors, omission, and misrepresented Plaintiff's title and the nature of her position on her on her application for promotion.

92.     On April 05, 2021, Ballard failed to promoted Dr. Morris to GS-14.

93.     Dr. Morris' position of Program Manager qualifies for a promotion to GS-14.

94.     Dr Morris has still not received a promotion to GS-14.

95.     There exists a causal link between Dr. Morris's protected Title VII activity and the adverse employment actions of Mr. Ballard.

96.     Therefore, Mr. Ballard retaliated against Dr. Morris.

## DISPARATE TREATMENT

97.     The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

98.     Dr. Morris has suffered disparate treatment at the hands of the Department of Veterans Affairs.

99.     A person suffers disparate treatment in her employment, within meaning of Title VII, when he or she is singled out and treated less favorably than others similarly situated on account of race.

100.    Dr. Morris was singled out by way of assigning an overseer to monitor her performance and removing her hiring authority.

101.    Dr. Morris was treated less favorably than others similarly situated on account of her race, as evidenced by Mrs. Anne Wright, a far less experienced, Caucasian candidate, receiving the Chief of Social Work service position rather than Dr. Morris, who has decades of internal departmental experience, as well as Mr. Ballard purposefully sabotaging her promotion efforts.

Additionally, Dr. Morris hired Ms Wright into the VA approximately four years prior to Ms Wright being hired as Chief Social Work service.

102.    Therefore, Dr. Morris has suffered disparate treatment at the hands of the Department of Veterans Affairs.

## PROCEDURAL REQUIREMENT

103.    The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

104.    In Agency Case No. 2003-0598-2021103775, a Final Agency Decision was reached on August 31, 2022.

105.    This lawsuit is being filed within 90 days of the Plaintiff receiving the Final Agency Decision.

106.    In EEOC Case No. 490-2020-00044X, Agency No. 2003-0598-2019103584, no decision has been rendered in the 180 days. Therefore, the Plaintiff has a right to file this federal lawsuit.

## DAMAGES

107.    The Plaintiff hereby incorporates by reference and re-alleges all preceding paragraphs as if fully set forth herein.

108.    The Plaintiff is entitled to a promotion to the GS-14 level.

109.    As a direct and proximate result of the discriminatory treatment the Plaintiff has been subjected to, and the Defendant's failure to follow the law in passing over the Plaintiff for hire, she has sustained injuries and damages, which injuries and damages consist of, but are not limited to, the following:

a.    Past loss of income which should be awarded as back pay.

b.      Emotional harm suffered, including mental anguish, inconvenience, loss of enjoyment of life, humiliation, and other psychological damages, with physical manifestations, in an amount to be proven at trial.

c.      Compensatory, general, special, incidental, and consequential damages caused by the Defendants' conduct.

d.      Punitive damages in an amount necessary and sufficient to deter the Defendant, as well as others similarly situate, and to punish Defendants for their willful, wanton, reckless, and/or egregious conduct.

e.      Future value of any lost earnings, lost wages, or working time lost.

f.      The Plaintiff's costs.

g.      A reasonable attorney's fee as allowed by law.

h.      Other damages as may be more particularly described during the course of the litigation.

i.      Any and all other just and proper relief to which the Plaintiff may be entitled.

## JURY DEMAND

110.    The Plaintiff respectfully demands a trial by Jury on all issues triable of right to a jury.

111.    The Plaintiff reserves the right to plead further in this matter.

## REQUEST FOR RELIEF

WHEREFORE, for the unlawful employment practices described above, the Plaintiff respectfully prays for judgment to be entered against the Defendant in an amount necessary to compensate the Plaintiff for all of the damages alleged herein, that she be granted a promotion to GS-14, that she be granted her costs and attorney's fees as allowed by law, and that

she be granted any and all other equitable and legal relief that is just and proper under the law.

Respectfully Submitted,

Dr. Estella Morris

Prepared By: */s/ Ben Honaker*
Ben Honaker
Arkansas Bar No. 2017108
124 West Capitol Ave., Suite 1900
Little Rock, AR 72201
Telephone: 501.247.6975
Email: ben@benhonakerlaw.com